DocuSign Envelope ID: F3D8B363-8334-45BC-8EC4-A881C903F5EF

# STANDARD REINSURANCE AGREEMENT

## between the

## FEDERAL CROP INSURANCE CORPORATION

## and the

## PRODUCERS AGRICULTURE INSURANCE COMPANY

(Hereafter "Company")

Amarillo, Texas

This Agreement establishes the terms and conditions under which the Federal Crop Insurance Corporation (FCIC), supervised by the Risk Management Agency (RMA) as authorized in section 226A of the Federal Agriculture Improvement and Reform Act of 1996, will provide subsidy and reinsurance on eligible crop insurance contracts sold by the Company. This Agreement is authorized by the Federal Crop Insurance Act (Act) and regulations of FCIC published at 7 C.F.R. chapter IV (regulations).

This is a cooperative financial assistance agreement between FCIC and the Company to deliver eligible crop insurance contracts under the authority of the Act. The Agreement is not considered a contract for the purposes of the Federal Acquisition Regulations. For the purposes of this Agreement, use of the plural form of a word includes the singular and use of the singular form of a word includes the plural unless the context indicates otherwise. The Table of Contents and headings in this Agreement are descriptive only and have no legal effect on FCIC or the Company.

This Agreement becomes effective upon its execution by FCIC and the Company, and the annual approval of the Company's Plan of Operations by FCIC for the applicable reinsurance year. This Agreement is a single year agreement.



**EXHIBIT**

**B**

DocuSign Envelope ID: F3D8B363-8334-45BC-8EC4-A881C903F5EF

# TABLE OF CONTENTS

Pages

**SECTION I. DEFINITIONS** ................................................................................ 1-9

**SECTION II. REINSURANCE**

    (a)     General Terms ............................................................... 10-13
    (b)     Reinsurance .................................................................. 13-21

**SECTION III. SUBSIDIES, EXPENSES, FEES, AND PAYMENTS**

    (a)     Subsidies and Expenses ............................................. 21-27
    (b)     Administrative Fees ...................................................... 27
    (c)     Payments ..................................................................... 27-29

**SECTION IV. GENERAL PROVISIONS**

    (a)     Collection of Information and Data ............................ 29-30
    (b)     Reports ........................................................................ 30-33
    (c)     Interest ........................................................................ 34
    (d)     Escrow Account .......................................................... 34-35
    (e)     Supplemental Insurance .............................................. 35
    (f)     Insurance Operations ................................................. 35-37
    (g)     Access to Records and Operations ............................ 37-38
    (h)     Compliance and Corrective Action ........................... 38-41
    (i)     Suspension .................................................................. 41-42
    (j)     Termination ................................................................. 42-43
    (k)     Disputes and Appeals ................................................. 43
    (l)     Agreement Change Date .............................................. 43
    (m)    Funding Contingency .................................................. 43
    (n)     Previous Obligations ................................................... 44
    (o)     Preemption of State Law ............................................. 44
    (p)     Discrimination ............................................................. 44
    (q)     Set Off ........................................................................ 44-45
    (r)     Assignment ................................................................. 45-46

DocuSign Envelope ID: F3D8B363-8334-43BC-8EC4-A861C903F5EF

# Section I. Definitions

Unless otherwise provided, the definitions of terms herein only apply to the terms and conditions contained in this Agreement and not to FCIC procedures or other documents related to this Agreement.

To the maximum extent practicable, terms that have been defined in the incorporated regulations and the Act will be given the same meaning for the purpose of this Agreement. Since some terms may have more than one definition in the regulations and the Act, the specific regulation or section of the Act to be used will be specified herein.

**"Act"** in lieu of the definition in the incorporated regulations**,** means the Federal Crop Insurance Act (7 U.S.C. §§ 1501-1524).

**"Actuarial data master file"** means the electronic data processing (EDP) compatible information distributed by FCIC that contains premium rates, program dates, and related information concerning the crop insurance program for a crop year.

**"Additional coverage"** has the same meaning as the term "additional coverage" in section 502(b)(1) of the Act (7 U.S.C. § 1502(b)(1)).

**"A&O subsidy"** means the subsidy for the administrative and operating expenses paid by FCIC on behalf of the policyholder to the Company for additional coverage level eligible crop insurance contracts in accordance with section 508(k)(4) of the Act (7 U.S.C. § 1508(k)(4)).

**"Administrative fee"** means the processing fee the policyholder must pay under an eligible crop insurance contract.

**"Affiliate"** means any person, including, but not limited to, a managing general agent, agent, service provider, and loss adjuster, that: (1) collects premiums, services the policy, adjusts, or settles claims; (2) collects, processes, manages, and reports electronic data for the purposes of selling, administering, or servicing eligible crop insurance contracts for the Company; or (3) directly or indirectly, through one or more intermediaries, has the authority to control any aspect of the management of the book of business or any other decision made under this Agreement, without the prior and specific approval from the Company. This definition excludes commercial reinsurers and PICs if such reinsurers or PICs do not have the authority to control any aspect of the management of the book of business or any other decision made under this Agreement, without the prior and specific approval from the Company.

**"Agency"** means the person authorized by an AIP, or its designee, to sell and service eligible crop insurance contracts under the Federal crop insurance program.

**"Agent"** means any individual who is: (1) licensed by the State in which eligible crop insurance contracts are sold and serviced for the reinsurance year; and (2) authorized by

DocuSign Envelope ID: F5D8B363-8334-43BC-8EC4-A881C903F5EF

the Company, or the Company's designee, to sell and service such eligible crop insurance contracts.

**"Agent of record"** means, for the purposes of each eligible crop insurance contract, any agent or subagent who: (1) for a new or revised application, signs the application; and (2) for any crop year, signs the acreage or similar reports, as applicable. Each eligible crop insurance contract has at least one, and may have multiple, agents of record. All agents of record for each eligible crop insurance contract shall be reported by the Company, in accordance with Appendix III.

**"Agreement"** means this Standard Reinsurance Agreement, including Appendices, the Act, and regulations, in effect as of the July 1 start of the reinsurance year, unless otherwise provided for in the Agreement. An Agreement in effect for a reinsurance year constitutes a separate and distinct Agreement from any Agreement that may be in effect for any other reinsurance year, even if the Agreement has been renewed in accordance with section IV(l). Unless specifically provided for in this Agreement, if there is a conflict between a provision of the Act, the regulations, or FCIC procedures with the terms of this Agreement, the order of precedence will be: (1) the provisions of the Act; (2) the regulations; (3) this Agreement; and (4) FCIC procedures, with (1) controlling (2) and (2) controlling (3), etc. The Act and regulations are available on the RMA website (www.rma.usda.gov).

**"Agricultural commodity"** has the same meaning as the term "agricultural commodity" in section 518 of the Act (7 U.S.C. § 1518), excluding livestock.

**"Annual settlement"** means the settlement of accounts between the Company and FCIC for the reinsurance year, beginning with the October monthly transaction cutoff date following the end of the subsequent reinsurance year and continuing monthly thereafter, as necessary.

**"Approved insurance provider (AIP)"** means a legal entity, including the Company, which has entered into a Standard Reinsurance Agreement with FCIC for the applicable reinsurance year.

**"Average A&O rate"** means the total amount of A&O subsidy paid to all AIPs for the 2008 reinsurance year for all eligible crop insurance contracts divided by total net book premium earned by all AIPs for the 2008 reinsurance year for all eligible crop insurance contracts for which A&O subsidy was paid by FCIC, as of the January 2010 monthly settlement report.

**"Billing date"** means the date specified in the actuarial data master file as the date by which policyholders are billed for premium due on eligible crop insurance contracts.

**"Book of business"** means the aggregation of all eligible crop insurance contracts between the Company and its policyholders that have a sales closing date within the reinsurance year and are eligible to be reinsured under this Agreement.

DocuSign Envelope ID: F3D8B363-8334-43BC-8EC4-A881C903F5EF

**"Cancellation date"** has the same meaning as the term "cancellation date" in the applicable eligible crop insurance contract.

**"Catastrophic risk protection (CAT)"** has the same meaning as the term "catastrophic risk protection" in the applicable eligible crop insurance contract.

**"CAT LAE"** means the reimbursement paid by FCIC for eligible crop insurance contracts at the CAT level (as authorized in section 508(b) of the Act) (7 U.S.C. § 1508(b)) in accordance with section 508(b)(11) of the Act (7 U.S.C. § 1508(b)(11)).

**"Cede"** means to pass to another all or part of the net book premium and associated liability for ultimate net losses on eligible crop insurance contracts.

**"Claim"** means a request under an eligible crop insurance contract for an indemnity in an amount certain on a Company form that meets FCIC's standards.

**"Claims supervisor"** means any person having immediate or day-to-day supervisory control, management or oversight authority of the activities of loss adjusters or other persons who determine whether an indemnity will be paid and the amount thereof.

**"Company payment date"** means the last business day of the month.

**"Compensation"** means, for any reinsurance year, commissions, salary, profit sharing, and other forms of payment including, but not limited to, transfer or other types of bonuses, consulting fees, loans, advance payments, deferred payments, cooperative advertising, and any monetary or non-monetary benefits of value, except for those benefits required by law, in accordance with FCIC procedures. Compensation does not include any payments related to a line of insurance not reinsured under this Agreement unless such payment is made to circumvent the provisions of this Agreement.

**"Contract change date"** has the same meaning as the term "contract change date" in the applicable eligible crop insurance contract.

**"Controlled Substance"** has the meaning provided in 7 C.F.R. § 3021.610.

**"Conviction"** has the meaning provided in 7 C.F.R. § 3021.615.

**"Cooperative association"** for the purposes of section 508(b)(5)(B) of the Act (7 U.S.C. § 1508(b)(5)(B)) means a member owned and controlled entity that is recognized by the State in which the entity is doing business as a cooperative related to agriculture.

**"Criminal Drug Statute"** has the meaning provided in 7 C.F.R. § 3021.625.

**"Drug-free Workplace"** has the meaning provided in 7 C.F.R. § 3021.635.

DocuSign Envelope ID: F3D8B363-8334-43BC-8EC4-A881C903F5EF

**"Earned premium rate (EPR)"** means the total net book premium earned by all AIPs for the 2008 reinsurance year on all eligible crop insurance contracts for which A&O subsidy was paid by FCIC divided by total liability, as of the January 2010 monthly settlement report.

**"Eligible crop insurance contract"** means an insurance contract with an eligible producer: (1) covering an agricultural commodity authorized to be insured under the Act and approved for sale by FCIC; (2) with terms and conditions in effect as of the applicable contract change date; (3) that is sold and serviced in accordance with the Act, FCIC regulations, FCIC procedures, and this Agreement; and (4) that has a sales closing date within the reinsurance year.

**"Eligible producer"** means a person who has an insurable interest in an agricultural commodity, has not been determined ineligible to participate in the Federal crop insurance program, and possesses a United States issued social security number (SSN) or employer identification number (EIN).

**"Employee"** has the meaning provided in 7 C.F.R. § 3021.640.

**"Experienced agent"** means an agent who has completed at least one full year of sales and service, and is current on certification requirements as may be required by FCIC.

**"Experienced loss adjuster"** means a loss adjuster who has completed at least one full year of loss adjustment and is current on certifications as may be required by FCIC.

**"FCIC payment date"** means the first banking day following the 14th calendar day after FCIC receives the signed, certified monthly or annual settlement report and supporting data from the Company upon which any payment is based.

**"FCIC procedures"** means the applicable handbooks, manuals, bulletins, memoranda or other written directives issued by FCIC related to an eligible crop insurance contract and this Agreement.

**"FSA"** has the same meaning as the term "Farm Service Agency" in section 1 of the Common Crop Insurance Policy Basic Provisions.

**"Immediate family"** means an individual's father, mother, stepfather, stepmother, brother, sister stepbrother, stepsister, son, daughter, stepson, stepdaughter, grandparent, grandson, granddaughter, father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, the spouse of the foregoing, and the individual's spouse.

**"Inspection"** means verification:

> (1)     As to whether the application, production report, acreage report, notice of claim, or other relevant documents in accordance with FCIC procedures

DocuSign Envelope ID: F3D8B363-8334-43BC-8EC4-A861C303F5EF

were timely submitted;

(2)    Of the information reported on the documents:

    (A)    Referenced in (1) above, and related to the claim, including preliminary and final loss adjustment (Verification of the approved yields will consist of examination of the records supporting the last three years certified for the crop); and

    (B)    Related to pre-harvest, growing season, or pre-acceptance examination of the crop;

(3)    That policy documents, including, but not limited to, actuarial documents, have been properly used and applied;

(4)    That the reported practice is being carried out in accordance with good farming practices;

(5)    That the crop has been planted, or replanted as applicable;

(6)    That the policy constitutes an eligible crop insurance contract;

(7)    That the producer qualifies as an eligible producer; and

(8)    That the agent or loss adjuster has complied with FCIC procedures.

**"Insurable interest"** has the same meaning as the term "share" in the applicable eligible crop insurance contract.

**"Loan"** for purposes of the definition of compensation means a lending agreement that transfers money or other items of value from the Company, or its MGA, to a person on the condition that it will be paid back later. Loans are considered compensation unless:

(1)    Such lending agreement was entered into before July 1, 2010; or

(2)    The terms of such lending agreement are commercially reasonable and the Company annually until the loan has been fully repaid, in the Plan of Operations, certifies that the terms of each lending agreement have not been breached and have not and will not be forgiven.

**"Loss adjuster"** means an individual who is licensed by a State, or has passed a proficiency testing program approved by FCIC, as applicable, and who verifies information affecting the coverage and makes factual determinations regarding the existence or amount of loss under an eligible crop insurance contract.

**"Loss ratio"** means the ratio calculated by dividing the ultimate net loss by the net book premium, expressed as a percentage. For example, if $1 ultimate net loss is paid and 50 cents net book premium is received, this would be expressed as a 200 percent loss ratio.

**"Managing General Agent (MGA)"** means an entity that meets the definition of managing general agent under the laws of the State in which such entity is incorporated and in every other state in which it operates, or in the absence of such State law or regulation, meets the definition of a managing general agent or agency in the National Association of Insurance Commissioners Managing General Agents Act, or a successor Act.

**"Material"** means an act or omission that, as determined by FCIC, would: (1) cause FCIC to assume a significant additional risk that it would not otherwise have assumed but for the act or omission; (2) cause the amount paid by or to FCIC to significantly differ from the amount that would otherwise be paid or owed but for the act or omission; (3) likely preclude or make it substantially more difficult to carry out the requirements of the Agreement and FCIC procedures; or (4) create a program vulnerability that could cause a payment to be made that would be significantly different than would otherwise be made if the act or omission had not occurred.

**"Net book premium"** means the premium amount established by FCIC for eligible crop insurance contracts in accordance with section 508(d)(2) of the Act (7 U.S.C. § 1508(d)(2)), less any amount for A&O subsidy.

**"New agent"** means an agent who has not completed one full year of sales and service.

**"New loss adjuster"** means a loss adjuster who has not completed one full year of loss adjustment.

**"Person"** means an individual or legal entity.

**"Personally Identifiable Information"** means any information about an individual maintained by the Company and its affiliates, including but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual.

**"Plan of insurance"** means a broad category of crop insurance contracts such as actual production history (APH), yield protection, revenue protection, etc. that has been designated by FCIC as a separate plan of insurance.

**"Plan of Operations"** means the documents and information the Company shall submit in accordance with section IV(f)(2), Appendix II, and applicable FCIC procedures.

**"Policy Acceptance and Storage System (PASS)"** means any RMA or FCIC approved electronic data processing (EDP) system that receives and accepts or rejects Company-submitted data for eligible crop insurance contracts.

**"Policy Issuing Company (PIC)"** means an insurance company that issues eligible crop insurance contracts reinsured under this Agreement on behalf of the Company and cedes 100 percent of the premiums and associated losses to the Company.

**"Policyholder"** means an eligible producer who has been issued one or more eligible crop insurance contracts.

**"Producer premium"** means that portion of the premium for an eligible crop insurance contract payable by the policyholder.

**"Protected Information"** means any Personally Identifiable Information about a policyholder, or information about the policyholder's farming operation or insurance policy, acquired from the policyholder, USDA, the Comprehensive Information Management System, or the policyholder's previous or current approved insurance provider or agent that is protected from disclosure by the Privacy Act of 1974 (5 U.S.C. § 552a), section 502(c) of the Act (7 U.S.C. § 1502(c)), or any other applicable Federal statute. This definition includes all hard copy or electronic information.

**"Rebate"** means to pay, allow, or give, or offer to pay, allow or give, directly or indirectly, either as an inducement to procure insurance or after insurance has been procured, any benefit (including money, goods or services for which payment is usually made [except any service provided to fulfill an obligation of the Company under this Agreement]), discount, abatement, credit, or reduction of the premium named in the insurance policy and any other valuable consideration or inducement not specified in the policy.

**"Records"** means documentation in any form that relates to an eligible crop insurance contract or this Agreement. Such documentation includes original signed documents, or legible electronic images of the original signed documents, any other documents, or legible electronic images of any other documents, and electronic information either produced by the Company or an affiliate or obtained from outside sources or the policyholder that are utilized by the Company or an affiliate to establish, calculate, verify or determine a policyholder's program eligibility, insurance coverage, APH yields, premium, liability, or indemnity.

 **"Reinsurance year"** means the term of this Agreement beginning July 1 and ending on June 30 of the following year and, for reference purposes, identified by reference to the year containing June.

**"Relative"** means an individual who: (1) is immediate family; (2) resides in the household of; or (3) engages in business with respect to, a farming operation with the person in question, regardless of whether or not the individual is immediate family.

**"Retained"** as applied to ultimate net losses, net book premium, or book of business, means the remaining liability for ultimate net losses and the right to associated net book premiums after all reinsurance ceded to FCIC under this Agreement.

**"Risk subsidy"** means that portion of the premium for an eligible crop insurance contract paid by FCIC on behalf of the policyholder.

**"Sales closing date"** has the same meaning as the term "sales closing date" in the applicable eligible crop insurance contract.

**"Sales supervisor"** means any person having immediate or day-to-day supervisory control, management or oversight authority of the activities of sales agents or sales agency employees on behalf of the Company.

**"Satisfactory performance record"** means a record of performance that demonstrates substantial conformity with applicable requirements, as specified in section II(a)(9).

**"Satisfactory work performance"** means the work of the agent, loss adjuster, or other affiliate that is evaluated annually and found to be in compliance with the requirements of this Agreement.

**"Service provider"** means managing general agents, and any other entity (other than an agent or agency) who issues or services eligible crop insurance contracts; develops, operates or maintains the Information Technology systems or prepares or transmits data; or, who on a regional, State or other area basis, provides loss adjustment services. Regardless of any other factor, a service provider is an affiliate.

**"Signature"** means the affixing of a person's name in a distinctive way as a form of identification or authorization, including in an electronic or digital form as approved by FCIC.

**"State Group 1"** means Illinois, Indiana, Iowa, Minnesota, and Nebraska.

**"State Group 2"** means Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, North Carolina, North Dakota, New Mexico, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Virginia, Washington, and Wisconsin.

**"State Group 3"** means Alaska, Connecticut, Delaware, Hawaii, Maine, Massachusetts, Maryland, Nevada, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Utah, Vermont, West Virginia, and Wyoming.

**"Subagent"** means any individual: (1) licensed by a State in which an eligible crop insurance contract is sold and serviced for the reinsurance year; and (2) who provides on behalf of an Agent any sales or service, or assistance with sales and service, for some or all of the Agent's eligible crop insurance contract(s).

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A681C905F5EF

**"Total liability"** means the amount of liability for all eligible crop insurance contracts written by all AIPs for the 2008 reinsurance year for which A&O subsidy was paid by FCIC, as of the January 2010 monthly settlement report.

**"Trade association"** means an entity recognized by the State in which the entity is doing business as a trade association and shall not include an organization that is formed for the purposes of providing insurance.

**"Transaction cutoff date"** for weekly data reporting is 8 p.m. Central time on Friday of each week and for monthly data reporting is 8 p.m. Central time on Friday after the first Sunday of the month.

**"Ultimate net loss"** means the amount paid by the Company under any eligible crop insurance contract reinsured under this Agreement in settlement of any claim and in satisfaction of any judgment, arbitration award, or mediation (including any interest awarded as specified in section XI(e)(1) of Appendix I) rendered on account of a claim under an eligible crop insurance contract, less any recovery or salvage by the Company.

**"Underwriting"** means the determination by the Company that all terms and conditions of eligibility and coverage have been met to qualify the policy as an eligible crop insurance contract.

**"Underwriting Capacity Manager (UCM)"** means an FCIC system that monitors the amount of insurance authorized to be insured or reinsured, and accepts or rejects the application of an eligible producer based on the availability of such amount of insurance, if limits have been placed by Federal legislation or FCIC on the amount of insurance authorized to be insured or reinsured.

**"Underwriting gain"** means the amount by which the Company's share of retained net book premium exceeds its share of retained ultimate net losses.

**"Underwriting loss"** means the amount by which the Company's share of retained ultimate net losses exceeds its share of retained net book premium.

**"Verification"** means the determination of whether information submitted is true and accurate through independent third parties or independent documentation in accordance with FCIC procedures. With respect to certifications, asking the policyholder whether the information is true and accurate does not constitute verification.

**"Written Agreement"** has the same meaning as the term "written agreement" in the applicable eligible crop insurance contract.

DocuSign Envelope ID: F3D6B363-8354-43BC-8EC4-A681C905F5EF

## SECTION II. REINSURANCE

(a)    General Terms

    (1)    For the Company to receive reinsurance, A&O subsidy, CAT LAE, and risk subsidy under this Agreement, an insurance contract must qualify as an eligible crop insurance contract, except as otherwise specified in this Agreement.

    (2)    Notwithstanding paragraph (3), applications for eligible crop insurance contracts that are rejected by the UCM, as applicable, will not be eligible for reinsurance, A&O subsidy, CAT LAE, or risk subsidy.

    (3)    Except as specified below, the Company shall offer and market all plans of insurance for all crops in any State where actuarial documents are available in which it writes an eligible crop insurance contract and shall accept and approve applications from all eligible producers. The Company may not cancel an eligible crop insurance contract held by a policyholder so long as the policyholder remains an eligible producer and the Company continues to write eligible crop insurance contracts within the State, except as authorized by FCIC. The Company is not required to offer such plans of insurance as may be approved by FCIC under the authority of section 508(h) of the Act. (7 U.S.C. § 1508(h)). However, if the Company chooses to offer any such plan, it shall offer the plan in all approved states in which it writes an eligible crop insurance contract where such plan is made available and it shall comply with all provisions of this paragraph as to such plan.

    (4)    In exchange for premiums ceded by the Company to FCIC under this Agreement, FCIC will provide reinsurance to the Company with respect to such contracts in accordance with the provisions of this Agreement.

    (5)    A Company and its affiliates are prohibited from providing a rebate except as authorized in section 508(a)(9)(B) of the Act (7 U.S.C. § 1508(a)(9)(B)).

    (6)    A violation of paragraph (5) will result in the denial of reinsurance, A&O subsidy, CAT LAE, and risk subsidy, for all eligible crop insurance contracts for which such violation occurred, and may subject the person who committed or authorized the violation to administrative sanctions, including, but not limited to, disqualification under the Act or applicable regulations.

    (7)    Only the amount of net book premium authorized by FCIC in the approved Plan of Operations, including any amendments under Appendix II, shall be reinsured and subsidized under this Agreement.

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A681C905F5EF

(8)     The Company shall have the financial and operational resources, organization, experience, internal controls, and technical skills to meet the requirements, including addressing reasonable risks, associated with the Agreement, including 7 C.F.R. part 400, subpart L, as determined by FCIC.

    (A)     The Company shall provide information necessary to evaluate compliance with this paragraph as often as required by FCIC.

    (B)     The Company shall provide written notice to FCIC of any anticipated change in:

        (i)     Its service providers or the services they provide (e.g., software, software agreements, service agreements, etc.); or

        (ii)     Its, or its affiliates', business organization, operations, finances or the sales expectations of the Company, if such change:

            (I)     Is at variance with the Company's Plan of Operations; or

            (II)     Could affect the Company's ability to perform under the Agreement.

    (C)     If any change referenced in subparagraph (B) occurs, whether FCIC learns of the change by notice from the Company or otherwise:

        (i)     FCIC may require the Company to amend its Plan of Operations; or

        (ii)     The Company may submit to FCIC in writing a request to amend the Plan of Operations.

            (I)     The request must be approved by FCIC in writing before the amended Plan of Operations can become a part of this Agreement.

            (II)     The request will be evaluated in accordance with the FCIC procedures applicable to the original Plan of Operations, except that FCIC will also consider whether FCIC's risk is materially increased.

(III)   FCIC will not approve a request to amend the Plan of Operations if such amendment would materially increase the risk of loss to FCIC unless FCIC, at its sole discretion, determines that the amendment arises from an action of FCIC or the U.S. Department of Agriculture that substantially increases the risk of underwriting loss on eligible crop insurance contracts written by the Company.

(IV)   Changes to eligible crop insurance contracts made in accordance with the terms of such contract are not a basis for an amendment to the Plan of Operations.

(D)   If at any time during the reinsurance year FCIC cannot determine that the Company is in compliance with the requirements of this paragraph or FCIC learns that the Company may be in substantial risk for failure to comply with the requirements of this paragraph, the Company shall take corrective actions acceptable to FCIC in accordance with section IV(h)(4), or be subject to the remedies provided for in this Agreement.

(9)   The Company shall demonstrate a satisfactory performance record to obtain an Agreement and continue to hold an Agreement for the reinsurance year. The following will be reviewed to determine whether there is a satisfactory performance record:

(A)   In the most recent five reinsurance years, the Company and service providers shall demonstrate:

(i)   There is substantial conformity with the requirements of this Agreement, the regulations and FCIC procedures, as applicable;

(ii)   Any material deficiency was caused by circumstances beyond the Company's control, and that, as soon as the Company discovered the deficiency, the Company took timely and appropriate corrective action;

(iii)   There was no material misconduct on the part of the Company or its service providers; and

(iv)   To the satisfaction of FCIC, any other mitigating factors that would prove, notwithstanding any identified deficiency, the Company has a satisfactory performance record;

(B)    Whether the Company can, to the satisfaction of FCIC, demonstrate the ability to comply with the requirements of paragraph (8);

(C)    Whether the Company can demonstrate the ability to fulfill the requirements under this Agreement under various risk assessment scenarios, including, but not limited to, significant nationwide losses, the loss or failure of a service provider, the threats and risks outlined in section VI of Appendix II, or other risks as identified by FCIC; and

(D)    Whether FCIC or a State has identified any material deficiencies that may raise questions or concerns regarding the Company's ability to meet the requirements of this Agreement.

(10)    If the Company previously has not been an AIP, the Company and its service providers shall demonstrate to the satisfaction of FCIC that it can achieve and maintain a satisfactory performance record consistent with paragraph (9).

(11)    Failure to meet the conditions stated in paragraphs (8), (9), or (10), may subject the Company to appropriate remedies in this Agreement, including, but not limited to, denial of an Agreement, suspension of the Agreement or a reduction in the net book premium the Company is authorized to write.

(12)    Unless otherwise specifically approved by FCIC in advance in writing, the Company may only delegate its authority or control over the designation of eligible crop insurance contracts to reinsurance funds to its managing general agent and the Company shall include the delegation in its Plan of Operation.

(13)    Failure of the Company to comply with the provisions of this Agreement, including, but not limited to, timely submission of data and reports, does not excuse or delay the Company's requirement to pay any amount due to FCIC by the dates specified herein.

(14)    Neither the Company nor its affiliates shall assess service fees or additional charges on eligible crop insurance contracts reinsured and subsidized under this Agreement except as authorized by the Act or approved by FCIC in writing.

(b)    Reinsurance

(1)     The Company, in accordance with its Plan of Operations, may designate an eligible crop insurance contract to the Assigned Risk Fund by State. Any eligible crop insurance contract not specifically designated by the Company to the Assigned Risk Fund will automatically be assigned to the Commercial Fund by State.

(2)     Unless otherwise specified in Appendix III, if the Company elects to designate eligible crop insurance contracts to the Assigned Risk Fund, it shall do so not later than the transaction cutoff date for the week containing the 30th calendar day after the sales closing date for the eligible crop insurance contract, except:

    (A)     In the case of written agreements requiring annual FCIC approval or for the initial year of an eligible crop insurance contract associated with a written agreement only (excluding written agreements specified in Appendix III), not later than the transaction cutoff date for the week containing the 30th calendar day after FCIC approval;

    (B)     For the initial year of application for any agricultural commodity without a fixed sales closing date, the later of the transaction cutoff date for the week containing the 30th calendar day after the eligible producers signature date on the application, or the transaction cutoff date for the week containing the 30th calendar day prior to the cancellation date; and

    (C)     For the subsequent year of insurance for any agricultural commodity without a fixed sales closing date, the transaction cutoff date for the week containing the 30th calendar day prior to the cancellation date for the previous year.

(3)     Assigned Risk Fund Retention

    (A)     The Company shall retain a 20 percent interest in premium and associated ultimate net losses in the Assigned Risk Fund in each State. The remainder is ceded to FCIC.

    (B)     The associated net book premium of eligible crop insurance contracts assigned to the Assigned Risk Fund shall not exceed 75 percent of the Company's net book premium in each State.

    (C)     Unless otherwise specified in the Agreement, in the event the percentage of net book premium for eligible crop insurance contracts in the Assigned Risk Fund exceeds 75 percent of the aggregate net book premium for any State, the amount of premiums and associated liabilities in the Assigned Risk Fund will

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A881C905F5EF

be reduced pro-rata to 75 percent and the excess will be assigned by FCIC to the Commercial Fund for that State.

(4)    Commercial Fund Retention

(A)    The Company shall retain at least a 35 percent interest in premium and associated ultimate net losses in the Commercial Fund in each State. The remainder shall be ceded to FCIC.

(B)    The retention percentage for the Commercial Fund in each State shall be made in 5 percent increments and designated in the Company's Plan of Operations according to Appendix II.

(5)    Underwriting Loss

(A)    Commercial Fund

After the retentions under paragraph (4), the amount of underwriting loss retained by the Company for the Commercial Fund will be calculated within each State as the sum of the following:

(i)    For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 100 percent and is less than or equal to 160 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

(I)    Its retained net book premium;

(II)    The lesser of the Company's actual loss ratio or 160 percent, minus 100 percent; and

(III)    The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 65.0 percent |
| State Groups 2 and 3 | 42.5 percent |

(ii)    For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 160 percent and is less than or equal to 220 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

(I)    Its retained net book premium;

      (II)      The lesser of the Company's actual loss ratio or 220 percent, minus 160 percent; and

      (III)    The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 45.0 percent |
| State Groups 2 and 3 | 20.0 percent |

(iii)    For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 220 percent and is less than or equal to 500 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

      (I)      Its retained net book premium;

      (II)      The lesser of the Company's actual loss ratio or 500 percent, minus 220 percent; and

      (III)    The following percentage for the applicable State Group:

| | |
|---|---|
| State Group 1 | 10.0 percent |
| State Groups 2 and 3 | 5.0 percent |

(iv)    FCIC will assume 100 percent of that portion of the underwriting loss amount for which the Company's loss ratio exceeds 500 percent.

(B)    Assigned Risk Fund:

After the retentions under paragraph (3), the amount of the underwriting loss retained by the Company for the Assigned Risk Fund will be calculated within each State as the sum of the following:

(i)    For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 100 percent and is less than or equal to 160 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

      (I)      Its retained net book premium;

      (II)      The lesser of the Company's actual loss ratio or 160 percent, minus 100 percent; and

   (III) 7.5 percent.

  (ii) For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 160 percent and is less than or equal to 220 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

   (I) Its retained net book premium;

   (II) The lesser of the Company's actual loss ratio or 220 percent, minus 160 percent; and

   (III) 6.0 percent.

  (iii) For that portion of the underwriting loss amount for which the Company's loss ratio exceeds 220 percent and is less than or equal to 500 percent, the Company shall retain an amount of the underwriting loss equal to the product of the following:

   (I) Its retained net book premium;

   (II) The lesser of the Company's actual loss ratio or 500 percent, minus 220 percent; and

   (III) 3.0 percent.

  (iv) FCIC will assume 100 percent of that portion of the underwriting loss amount for which the Company's loss ratio exceeds 500 percent.

(6) Underwriting Gain

 (A) Commercial Fund

  After the retentions under paragraph (4), the amount of underwriting gain retained by the Company for the Commercial Fund will be calculated within each State as the sum of the following:

  (i) For that portion of the underwriting gain amount for which the Company's loss ratio is less than or equal to 100 percent but is greater than or equal to 65 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

    (I)  Its retained net book premium;

    (II)  100 percent minus [the greater of the Company's actual loss ratio or 65 percent]; and

    (III)  The following percentage for the applicable State Group:

|  |  |
|---|---|
| State Group 1 | 75.0 percent |
| State Groups 2 and 3 | 97.5 percent |

  (ii)  For that portion of the underwriting gain amount for which the Company's loss ratio is less than 65 percent but is greater than or equal to 50 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

    (I)  Its retained net book premium;

    (II)  65 percent minus [the greater of the Company's actual loss ratio or 50 percent]; and

    (III)  The following percentage for the applicable State Group:

|  |  |
|---|---|
| State Group 1 | 40.0 percent |
| State Groups 2 and 3 | 40.0 percent |

  (iii)  For that portion of the underwriting gain amount for which the Company's loss ratio is less than 50 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

    (I)  Its retained net book premium;

    (II)  50 percent minus the Company's actual loss ratio; and

    (III)  The following percentage for the applicable State Group:

|  |  |
|---|---|
| State Group 1 | 5.0 percent |
| State Groups 2 and 3 | 5.0 percent |

 (B)  Assigned Risk Fund

DocuSign Envelope ID: F3D6B363-8354-43BC-8EC4-A681C905F5EF

After the retentions under paragraph (3), the amount of underwriting gain retained by the Company for the Assigned Risk Fund will be calculated within each State as the sum of the following:

(i)      For that portion of the underwriting gain amount for which the Company's loss ratio is less than or equal to 100 percent but is greater than or equal to 65 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I)      Its retained net book premium;

(II)     100 percent minus [the greater of the Company's actual loss ratio or 65 percent]; and

(III)    22.5 percent.

(ii)     For that portion of the underwriting gain amount for which the Company's loss ratio is less than 65 percent but is greater than or equal to 50 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I)      Its retained net book premium;

(II)     65 percent minus [the greater of the Company's actual loss ratio or 50 percent]; and

(III)    13.5 percent.

(iii)    For that portion of the underwriting gain amount for which the Company's loss ratio is less than 50 percent, the Company shall retain an amount of the underwriting gain equal to the product of the following:

(I)      Its retained net book premium;

(II)     50 percent minus the Company's actual loss ratio; and

(III)    3.0 percent.

(7)    The Company's cumulative underwriting gain or loss shall be determined by summing the net underwriting gains or losses for all States for the Commercial and Assigned Risk Funds.

(8)    Net Book Quota Share

(A)    The Company shall cede to FCIC 6.5 percent of its cumulative underwriting gain or loss calculated in paragraph (7) and the associated premium and losses with such amount.

(B)    After the cession in subparagraph (A):

(i)    Any underwriting gain due the Company will be paid by FCIC to the Company at annual settlement.

(ii)    Any underwriting loss of the Company will be paid to FCIC on each monthly settlement report for which there is an underwriting loss.

(9)    Disbursement of Gains from the Net Book Quota Share

(A)    If the sum of all AIPs Net Book Quota Share, calculated in accordance with paragraph (8), results in a net underwriting gain to be paid to FCIC for the reinsurance year, a portion of any such net underwriting gain will be disbursed to the Company as a payment equal to the product of the following:

(i)    The ratio of the Company's total net book premium for additional coverage eligible crop insurance contracts for all funds in State Group 3 relative to total net book premium for additional coverage eligible crop insurance contracts of all AIPs for all funds in State Group 3; and

(ii)    1.5 percent of the sum of all underwriting gains and losses calculated in accordance with paragraph (7) for all AIPs for the reinsurance year.

(B)    Any disbursement under this paragraph will be made at annual settlement.

(10)    Contingency Fund

(A)    The Contingency Fund, which is part of the insurance fund authorized under section 516(c) of the Act (7 U.S.C. § 1516(c)), is used to offset expenses incurred by FCIC to administer a Company's book of business in the event of Company supervision, rehabilitation, insolvency or operational deficiency, or an

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A881C905F5EF

equivalent event, as determined by FCIC, or the Agreement is terminated for cause.

(B)    Any amounts owed to FCIC by the Company in accordance with sections II(a)(6), II(b)(12), IV(b)(7), IV(h), and IV(j)(4) will be accounted for in the Contingency Fund.

(11)    The Company may reinsure its liability for ultimate net losses remaining after all retentions, designations, and assignments under this Agreement. Insurance companies that qualify as PICs are not precluded from entering into reinsurance arrangements with the Company. The Company shall inform FCIC in writing of all reinsurance arrangements that relate to eligible crop insurance contracts. Reinsurance arrangements, unless otherwise specified by FCIC in writing, must meet the definition of, and the standards applicable to:

(A)    Reinsurance in the National Association of Insurance Commissioners (NAIC) Credit for Reinsurance Model law, or a NAIC model successor law;

(B)    Standards for reinsurance under the NAIC Accounting Practices and Procedures Manual including any revisions or updates; and

(C)    Any other relevant standards developed by the NAIC for credit for reinsurance.

(12)    In addition to other remedies provided in this Agreement, FCIC may, at its sole discretion, offer additional reinsurance beyond what is otherwise provided in this Agreement whenever the Company reports an amount of net book premium greater than the amount FCIC has authorized, in accordance with Appendix II. FCIC may cause the underwriting gain or loss after the cession determined in paragraph (8)(A), payable to or by the Company, to be reduced according to the ratio of the excess net book premium to the total reported net book premium. The excess will then be reinsured under this Agreement. The Company agrees to pay FCIC a reinsurance premium equal to 5 percent of the excess net book premium whenever this provision applies.

# SECTION III. SUBSIDIES, EXPENSES, FEES, AND PAYMENTS

(a)    Subsidies and Expenses

(1)    Risk subsidy shall be determined in accordance with the Act and will be provided on behalf of policyholders to the Company on the monthly settlement report specified in paragraph (2)(B) below.

(2)　　A & O Subsidy and CAT LAE

(A)　　Notwithstanding the provisions of this section, under no circumstances will A&O subsidy or CAT LAE be paid in excess of the amounts authorized by the Act.

(B)　　A&O subsidy and CAT LAE will be paid to the Company after the Company submits, and FCIC accepts, acreage reports, or other similar reports (e.g., preliminary tonnage report for eligible raisin crop insurance contracts, or inventory value reports for nursery and clam crop insurance contracts, annual farm report for eligible AGR crop insurance contracts). The initial payment to the Company of A&O subsidy and CAT LAE will be based on information reported on the September monthly settlement report following the end of the reinsurance year, and will be adjusted monthly thereafter.

(C)　　For any eligible crop insurance contract for CAT coverage, A&O subsidy will be 0.0 percent of net book premium; for CAT LAE, 6.0 percent of the net book premium.

(D)　　For eligible crop insurance contracts with additional coverage that provide coverage under an area-based, or similar plan of insurance, the A&O subsidy will be:

(i)　　Except as provided in clause (ii), 12.0 percent of the net book premium for such eligible crop insurance contracts.

(ii)　　For area-based or similar plans of insurance that were not widely available as of the 2008 reinsurance year, 20.1 percent of the net book premium for such eligible crop insurance contracts.

(E)　　For an agricultural commodity in a county for which FCIC did not establish premium rates in the actuarial data master file for the 2010 reinsurance year and excluding eligible crop insurance contracts subject to subparagraphs (C) and (D):

(i)　　For additional coverage eligible crop insurance contracts that provide coverage under a revenue plan of insurance that can increase liability whenever the market price at the time of harvest exceeds the market price at the time of planting, 18.5 percent of the net book premium.

(ii)　　For all other eligible crop insurance contracts, 21.9 percent of the net book premium.

DocuSign Envelope ID: F3D5B363-8354-43BC-8EC4-A681C905F5EF

(F)     Subject to the limitations provided in subparagraphs (G) and (H) and excluding eligible crop insurance contracts subject to subparagraphs (C), (D), and (E), A&O subsidy will be determined and paid as set forth below.

   (i)     For additional coverage eligible crop insurance contracts that provide coverage under a revenue plan of insurance that can increase liability whenever the market price at the time of harvest exceeds the market price at the time of planting, 18.5 percent of the net book premium.

   (ii)    For all other eligible crop insurance contracts, 21.9 percent of the net book premium.

(G)     Notwithstanding the provisions contained in subparagraph (F):

   (i)     If the sum of the A&O subsidies for all AIPs for all eligible crop insurance contracts subject to subparagraph (F) for the reinsurance year exceeds the product of the following:

      (I)      Total liability;

      (II)     EPR;

      (III)    Average A&O rate;

      (IV)     1.0509; and

      (V)      0.615; then

   (ii)    The total A&O subsidy paid to the Company for eligible crop insurance contracts subject to subparagraph (F) will be equal to the product of:

      (I)      The total A&O subsidy calculated for the Company according to subparagraph (F); and

      (II)     The ratio of clause (i) above divided by the sum of the A&O subsidies for all AIPs for all eligible crop insurance contracts calculated according to subparagraph (F) for the reinsurance year.

   (iii)   Any adjustment to the A&O subsidy amount determined in accordance with subparagraph (G) will be made on the monthly settlement report for the applicable reinsurance

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A881C905F5EF

year and adjustments will end on the first annual settlement report for the reinsurance year.

(H)     Notwithstanding the provisions contained in subparagraph (F):

    (i)     If the sum of the A&O subsidies for all AIPs for all eligible crop insurance contracts subject to subparagraph (F) for the reinsurance year is less than the product of the following:

        (I)     Total liability;

        (II)    EPR;

        (III)   Average A&O rate;

        (IV)    1.0509; and

        (V)     0.489; then

    (ii)    The total A&O subsidy paid to the Company for eligible crop insurance contracts subject to subparagraph (F) will be equal to the product of:

        (I)     The total A&O subsidy calculated for the Company according to subparagraph (F); and

        (II)    The ratio of clause (i) above divided by the sum of the A&O subsidies for all AIPs for all eligible crop insurance contracts calculated according to subparagraph (F) for the reinsurance year.

    (iii)   Any adjustment to the A&O subsidy amount determined in accordance with subparagraph (H) will be made on the first annual settlement report for the reinsurance year.

(I)     Notwithstanding subparagraphs (E) through (H), FCIC will pay additional A&O subsidy for eligible crop insurance contracts in States in which the loss ratio is greater than 120 percent of the total net book premium written in the State by all AIPs as follows:

    (i)     FCIC will pay an additional A&O subsidy amount equal to 1.15 percent times the net book premium for eligible crop insurance contracts subject to subparagraphs (E) and (F) and calculated according to subparagraphs (E) and (F); and

DocuSign Envelope ID: F5D8B363-8354-43BC-8EC4-A881C905F5EF

(ii)    Any adjustment to the loss ratio for a State will be made on the monthly settlement report for the applicable reinsurance year and adjustments will end subject to the limitations for submitting data through automated systems, in accordance with Appendix III.

(J)    In addition to other provisions of this Agreement, the amount of A&O subsidy may be adjusted to a level that FCIC determines to be equitable if issuing or servicing eligible crop insurance contracts involves expenses that vary significantly from the basis used to determine the A&O subsidy under this section.

(K)    The Company, for itself and any persons whose rights are derivative of the Company (including, but not limited to, assigns, successors, and representatives) hereby covenants and agrees that it will not institute or file any judicial or administrative proceeding, or cause the instituting or filing (directly or indirectly) of any judicial or administrative proceeding, or assist any third party that has instituted or filed any judicial or administrative proceeding, against FCIC, RMA, the United States Department of Agriculture, or any officer, agent, or director thereof (collectively, "FCIC"), challenging the legality of the terms and conditions of section III(a). Nothing in the forgoing precludes the Company from responding to a court order. This covenant and agreement may be pleaded by FCIC as a bar or release in the event any such judicial or administrative proceeding is instituted or filed. The Company and FCIC, prior to execution of this Agreement, had disputed the provisions of section III(a). That dispute now has been compromised in a manner mutually acceptable to the Company and FCIC, and, in consideration of that compromise, the Company agrees and covenants as set forth above. The Company shall require its agents to acknowledge in writing that the agents agree to and are bound by the same covenant not to sue contained in this paragraph. Such acknowledgement may be contained in an agent or other agreement.

(3)    The SSNs of all agents and loss adjusters, as applicable, who perform any service or related activity under an eligible crop insurance contract, shall be provided to FCIC in accordance with FCIC procedures. If the applicable SSN is not provided for an eligible crop insurance contract, the Company shall not receive any reinsurance for that eligible crop insurance contract until the appropriate SSN is provided.

(4)    Compensation to persons involved in the direct sale and service of any eligible crop insurance contract under this Agreement, in accordance with FCIC procedures, shall only be paid or provided as follows:

(A)    All compensation paid by the Company or its MGA shall be in writing, and provided to FCIC upon request.

(B)    Except as provided in subparagraph (C), in any State in which the Company is doing business, the Company, its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE calculated in accordance with subsection (a)(2) excluding any amounts paid under subsection (a)(2)(I), for such State.  The calculation of the 80 percent is based on the amount paid by FCIC on the first annual settlement report for the reinsurance year.

(C)    The Company, its MGA, or any affiliates may only provide compensation in excess of that permitted in subparagraph (B) if:

(i)    The Company has been paid an underwriting gain under section II(b)(7) on the first annual settlement report for the reinsurance year;

(ii)    For any State in which the Company is doing business, the total amount of all compensation paid under this subparagraph and subparagraph (B) does not exceed 100 percent of the total amount calculated for A&O subsidy and CAT LAE in accordance with subsection (a)(2), excluding any amounts paid under subsection (a)(2)(I), for such State. The calculation of the 100 percent is based on the amount paid by FCIC on the first annual settlement report for the reinsurance year; and

(iii)    The total amount of compensation paid under this subparagraph to all persons in all States for the reinsurance year does not exceed:

(I)    The underwriting gain paid to the Company under section II(b)(7) on the first annual settlement report for the reinsurance year; less

(II)    Any net book quota share ceded to FCIC by the Company under section II(b)(8) on the first annual settlement report for the reinsurance year; plus

(III)    Any disbursement of gains from the net book quota share received by the Company from FCIC under section II(b)(9) on the first annual settlement report for the reinsurance year; less

DocuSign Envelope ID: F5D6B563-8354-43BC-8EC4-A881C905F5EF

(IV)  Any amounts obligated by the Company under reinsurance arrangements with entities that are not owned, in whole or in part, and controlled by the Company subject to section II(b)(11) for the reinsurance year; plus

(V)  Any ceding commissions or other amounts received by the Company for reinsurance arrangements subject to section II(b)(11) for the reinsurance year.

(E)  If FCIC discovers that the Company, its MGA, or affiliate has paid compensation in excess of the amounts allowed in subparagraphs (B) or (C), the Company will be subject to any sanction described in this Agreement or applicable regulations. Any scheme or device to circumvent the limitations in subparagraphs (B) or (C) will be considered a violation of this Agreement.

(b)  Administrative Fees

The Company shall remit to FCIC all administrative fees collected in accordance with the applicable eligible crop insurance contract and the following:

(1)  In the event the policyholder is a limited resource farmer as defined in the regulations, the Company shall submit the required information to FCIC and FCIC will waive the applicable fees on the monthly settlement report.

(2)  The Company shall terminate eligible crop insurance contracts if administrative fees are not paid by the date specified in the applicable eligible crop insurance contract for CAT coverage and report such termination to FCIC in accordance with FCIC procedures.

(3)  FCIC will perform debt collection activities for CAT administrative fees that have not been timely paid, provided the Company has followed FCIC procedures.

(c)  Payments

(1)  With respect to payments due FCIC from the Company:

(A)  Except as provided in subparagraph (B), all payments will be netted on the monthly and annual settlement reports with amounts due the Company from FCIC. FCIC will remit amounts due the Company by electronic funds transfer (EFT) on or before the FCIC payment date. Any amounts due FCIC or the Company that are not timely remitted are subject to the interest rate provisions contained in section IV(c),

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A881C905F5EF

with such interest accruing from the date such payment was due to the date of payment.

    (B)    Amounts due FCIC on the September monthly settlement report following the end of the reinsurance year will be netted with amounts due the Company on prior reinsurance year reports. The Company must remit amounts due no later than the Company payment date for the September monthly report. The A&O subsidy and CAT LAE shown on the September monthly settlement report following the end of the reinsurance year, will not be netted with amounts due from the Company, but will be paid no later than the third business day of October. All subsequent monthly or annual settlement reports for the reinsurance year will be paid as specified in subparagraph (A).

(2)    In the event that FCIC erroneously rejects data that was correctly submitted by the Company and a payment would be due to the Company if the data had not been rejected, the Company shall be entitled to interest accrued on this amount for the period of such delay, at the rate provided in section IV(c)(1).

(3)    Any funds paid by the Company to FCIC in the compromise and settlement of any dispute between FCIC and the Company in an amount less than FCIC claimed was due will be included on the monthly settlement report without regard to the provisions of section II(b).

(4)    Notwithstanding any other provision of this Agreement, if a review or examination reveals that the Company or its affiliates have committed an error or omission or failed to comply with a term of the Act, this Agreement, regulations, or FCIC procedures, FCIC will provide written notice to the Company within 3 years of the end of the insurance period when the error, omission or failure occurred, if the Company owes a debt to FCIC, unless the error, omission or failure was willful or intentional. The failure to provide timely notice required herein shall only relieve the Company from liability for the debt owed and not for other consequences of the error, omission or failure that address other obligations of the Company, including maintaining a satisfactory performance record. Written notice to the Company under this paragraph will:

    (A)    Describe the failure regarding compliance with a specified term of the Act, this Agreement, the regulations, or FCIC procedures;

    (B)    State that such failure results in an amount being owed to FCIC;

    (C)    Include the crop year and eligible crop insurance contract number(s) for which such failure occurred; and

DocuSign Envelope ID: F3D6B363-8354-43BC-8EC4-A681C905F5EF

(D)     Provide sufficient detail to put the Company on general notice of the type of error, omission or failure alleged (such as failure to properly calculate the approved yield or failure to conduct a pre-acceptance inspection, etc.).

(5)     The Company shall provide written notice, in a form similar to the notice in paragraph (4), to FCIC of any claim that funds may be owed from FCIC to the Company within 3 years after annual settlement of the reinsurance year in which such funds are claimed to be owed. Failure to provide such notice shall relieve FCIC of the obligation to repay any amount that would be owed to the Company. If an investigation by FCIC determines that funds may be owed by FCIC to the Company, written notice does not need to be provided.

## SECTION IV. GENERAL PROVISIONS

(a)     Collection of Information and Data

(1)     The Company is required to collect and provide to FCIC all SSNs or EINs that are required to be submitted by the policyholder under the eligible crop insurance contract, and the SSNs of all employees, affiliates, and other persons as required by FCIC procedures. SSNs or EINs shall be protected, as prescribed in the Privacy Act of 1974 (5 U.S.C. § 552a), by the Company and all of its affiliates with access to such information.

(2)     In accordance with section 502(c) of the Act (7 U.S.C. § 1502(c)), neither the Company, nor its personnel, or contractors, or affiliates may disclose to the public any information provided by the policyholder unless such disclosure is otherwise required by Federal law.

(3)     All persons who have access to Protected Information or Personally Identifiable Information, including, but not limited to, personnel, contractors, service providers and affiliates of the Company, shall sign a non-disclosure statement, in accordance with reporting and certification requirements contained in section XV of Appendix I.

(4)     The Company and all of its affiliates shall develop, implement, and maintain information controls and systems, including those pertaining to all Protected Information and records, in a manner consistent with the Federal Information Security Management Act (FISMA) (44 U.S.C. § 3541), or any Federal law covering Federal crop insurance information. FISMA is based on an on-going, risk-based process to identify, assess, plan, and strengthen information security. The Company shall make available audit and assessments examining its Information Technology security, both internal and external, to FCIC upon request.

DocuSign Envelope ID: F3D6B363-8354-43BC-8EC4-A681C905F5EF

(5)     The Company shall report any loss or unauthorized disclosure of Protected Information or Personally Identifiable Information to FCIC within one hour of discovery of the loss or unauthorized disclosure of such information in accordance with Appendix III, and shall not distinguish between suspected or confirmed losses or disclosures.

(b)     Reports

(1)     The Company is required to collect, maintain and submit to FCIC data that FCIC reasonably determines is necessary to the operation of the Federal crop insurance program. Data the Company is required to submit to FCIC shall be certified as accurate, detailed and submitted to FCIC in accordance with FCIC procedures.

(2)     Unless specifically approved by FCIC in writing, FCIC will reject any eligible crop insurance contract originally submitted by the Company after the February monthly transaction cutoff date following the reinsurance year.

(3)     Producer premiums and administrative fees collected by the Company shall be reported to FCIC in accordance with Appendix III.

(4)     The Company shall provide information to FCIC relating to eligible crop insurance contracts of the Company reinsured under this Agreement as specified herein and in Appendix III.

(5)     In addition to any other reporting requirement, the Company shall report the following information regarding each eligible crop insurance contract and have such information be accepted by FCIC not later than the applicable date specified in paragraph (6):

(A)     All names, SSNs, and EINs the policyholder is required to report under the eligible crop insurance contract;

(B)     The agricultural commodity to be insured under the eligible crop insurance contract;

(C)     The plan of insurance and coverage level, including the price election, elected by the eligible producer; and

(D)     The actual production history to be used to establish insurable yields under the applicable eligible crop insurance contract, as specified in Appendix III.

(6)     Information specified in paragraph (5) must be accepted by FCIC not later than:

(A)    For information required by paragraph (5), subparagraphs (A) through (C):

   (i)    In cases of written agreements requiring annual FCIC approval or for the initial year of a written agreement (unless otherwise specified in Appendix III), not later than the transaction cutoff date for the week containing the 30th calendar day after FCIC approval;

   (ii)   For any renewal or multi-year written agreement (unless otherwise specified in Appendix III), the transaction cutoff date for the week containing the 30th calendar day after the sales closing date for the eligible crop insurance contract;

   (iii)  For any agricultural commodity without a fixed sales closing date:

      (I)    For the initial year of application, the later of the transaction cutoff date for the week containing the 30th calendar day after the eligible producers signature date, or the transaction cutoff date for the week containing the 30th calendar day after the cancellation date;

      (II)   For any subsequent year of insurance, the transaction cutoff date for the week containing the 30th calendar day after the cancellation date; and,

   (iv)   For all other eligible crop insurance contracts not covered in subparagraphs (i) through (iii), the transaction cutoff date for the week including the 30th calendar day after the sales closing date for the eligible crop insurance contract.

(B)    For information required by paragraph (5), subparagraph (D), the transaction cutoff date for the week containing the 30th calendar day after the production reporting date for the eligible crop insurance contract, as specified in the actuarial data master file.

(7)    The A&O subsidy applicable to the eligible crop insurance contract determined in accordance with section III(a)(2) will be reduced whenever the information required by paragraph (5) has not been accepted by FCIC or such information is revised after the deadlines set forth in paragraph (6).

(A)    For information required by paragraph (6)(A), the A&O subsidy for the eligible crop insurance contract will be reduced by:

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A681C905F5EF

(i)    1 percentage point if the required information is first accepted or revised after the transaction cut-off date for the week containing the 30th calendar day after the sales closing date (or other cancellation, approval, or signature date specified in paragraph (6)), but prior to the transaction cut-off date for the week containing the 60th calendar day;

(ii)    2 percentage points if the required information is first accepted or revised after the transaction cut-off date for the week containing the 60th calendar day after the sales closing date (or other cancellation, approval, or signature date specified in paragraph (6)), but prior to the transaction cut-off date for the week containing the 90th calendar day; or

(iii)    3 percentage points if the required information is first accepted or revised after the transaction cut-off date for the week containing the 90th calendar day after the sales closing date (or other cancellation, approval, or signature date specified in paragraph (6)).

(B)    For information required by paragraph (6)(B), the A&O subsidy for the eligible crop insurance contract will be reduced by:

(i)    1 percentage point if the required information is first accepted after the transaction cut-off date for the week containing the 30th calendar day after the production reporting date, but prior to the transaction cut-off date for the week containing the 60th calendar day;

(ii)    2 percentage points if the required information is first accepted after the transaction cut-off date for the week containing the 60th calendar day after the production reporting date, but prior to the transaction cut-off date for the week containing the 90th calendar day; or

(iii)    3 percentage points if the required information is first accepted after the transaction cut-off date for the week containing the 90th calendar day after the production reporting date.

(C)    The sanctions under this paragraph may be reduced or waived if the delay is caused in whole or in part by FCIC.

(D)    If the eligible crop insurance contract or FCIC procedures require or allow the policyholder to make an election of, or change to, any

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A881C905F5EF

information required to be reported under paragraph (5), subparagraphs (A) through (C), after the applicable deadline specified in paragraph (6)(A), the A&O subsidy reduction in paragraph (7)(A) will not apply for that eligible crop insurance contract until the weekly transaction cutoff date containing the 30th calendar date after the date the policyholder is required to make such designation, or a determination by the Company in accordance with FCIC procedures, and the dates in paragraph (7)(A)(i), (ii), and (iii) are adjusted accordingly.

(E)     Nothing in paragraph (7)(B) shall limit the ability of the Company to correct, without application of reductions within (7)(B), any error in the information submitted under paragraph (5)(D) after acceptance of the information by FCIC in accordance with paragraph (6)(B).

(F)     The total of any A&O subsidy reductions in paragraph 7 for an eligible crop insurance contract will not exceed 3 percent.

(8)     The Summary of Coverage and billing statement provided to the policyholder shall, at a minimum, prominently display each of the following:

(A)     The amount of risk subsidy paid by FCIC on behalf of the policyholder;

(B)     The amount of premium and administrative fees due the Company from the policyholder;

(C)     The amount of A&O subsidy paid by FCIC to the Company on behalf of the policyholder, as calculated in accordance with sections III(a)(2)(D),(E), and (F) and prior to any adjustments made in accordance with sections III(a)(2)(G), (H), or (I); and

(D)     For purposes of displaying the A&O subsidy adjustment calculated in accordance with section III(a)(2)(I), a footnote stating: "The reported A&O subsidy amount may increase by 1.15 percent of the net book premium, if the loss ratio in the state exceeds 1.20 or may otherwise change if required by the Standard Reinsurance Agreement. However, the amount of premium the policyholder is required to pay will not change.

(c)    Interest

(1)    Any interest that the Company is required to pay FCIC under the terms of this Agreement will be paid at the simple interest rate of 15 percent per annum.

(2)    The Company will repay with interest any amount paid to the Company by FCIC that FCIC or the Company subsequently determines was not due.

(3)    FCIC will repay with interest any amount paid by the Company to FCIC, which FCIC subsequently determines was not due.

(4)    Interest on amounts determined not to be due will begin to accrue on the 31st day after the date that:

(A)    In the case of amounts owed to the Company, a written notification stating the amount claimed to be owed is provided to FCIC by the Company, as applicable, and end on the date the amount is paid in full; or

(B)    In the case of amounts owed to FCIC, the Company receives a final determination from FCIC or other written statement from FCIC that a specific amount is owed, as applicable, and end on the date the overpaid amount is paid in full. Appeal by the Company under this Agreement or 7 C.F.R. § 400.169 does not delay the date by which interest starts to accrue.

(d)    Escrow Account

(1)    At the Company's request, FCIC will allow the Company to establish an escrow account in the name of FCIC at a bank designated by the Company, and approved by FCIC, to reimburse the Company for payment of indemnities, prevented planting payments or replant payments to policyholders by the Company. The Company's bank shall pledge collateral as required by 31 C.F.R. § 202 in the amount determined by FCIC.

(2)    When an escrow account has been established, the Company may request FCIC to fund the escrow account by submitting indemnity data to FCIC in accordance with Appendix III. A request to fund the escrow account shall be deemed certified by an authorized officer or authorized employee of the Company that the information establishing the claim is correct and accurate. If the Company utilizes the escrow process to pay indemnities, prevented planting, or replant payments, the Company shall issue payment to the producer within 3 business days of submitting the request for escrow funding to FCIC.

(3)    Any Company that elects not to utilize escrow funding will be reimbursed for paid losses validated and accepted on the monthly settlement report.

(4)    The Company's bank may only draw funds from the escrow account when the instrument or document issued as payment of the indemnity, prevented planting payment or replant payment has cleared the Company's bank account.

(5)    If there is a shortfall of funds in the escrow account, it is the Company's responsibility to deposit funds to cover any shortages.

(e)    Supplemental Insurance

(1)    The Company shall not sell a contract of insurance or similar instrument, which is written in conjunction with an eligible crop insurance contract and not reinsured by FCIC, unless the Company has complied with the requirements of 7 C.F.R. § 400.713.

(2)    FCIC will not provide reinsurance for an eligible crop insurance contract if the Company sold a contract of insurance or instrument described in paragraph (1) that FCIC determines to have shifted risk to, or increases the risk of, such eligible crop insurance contract reinsured under this Agreement, or if the Company administers such insurance or instrument in a manner inconsistent with information submitted in accordance with 7 C.F.R. § 400.713.

(3)    The Company shall maintain, and make available at the request of FCIC, the underwriting information pertaining to a contract of insurance or instrument described in paragraph (1), including, but not limited to, the policy number and all SSNs and EINs related to the eligible crop insurance contract.

(4)    If the terms of a contract of insurance or instrument described in paragraph (1) become inconsistent with the terms of the eligible crop insurance contract causing payments to be made under the eligible crop insurance contract that would not otherwise be payable, reinsurance will be denied.

(f)    Insurance Operations

(1)    General

(A)    The Company shall verify yields and other information used to establish insurance guarantees and indemnity payments in accordance with the regulations and FCIC procedures.

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A881C905F5EF

(B)    The Company shall use contracts, standards, FCIC procedures, methods, and instructions as authorized by FCIC in the sale and service of eligible crop insurance contracts.

(C)    The Company shall comply with standards and FCIC procedures to create forms used in the sales and service of any eligible crop insurance contract.

(2)    Plan of Operations

(A)    The Company's complete Plan of Operations shall be submitted to FCIC by April 1 preceding the reinsurance year, unless otherwise authorized by FCIC. The Plan of Operations shall meet the requirements of this Agreement, including, but not limited to, the format and all requirements specified in Appendix II, to be considered a complete Plan of Operations.

(B)    The Plan of Operations contains integral terms to this Agreement so no Agreement exists for a reinsurance year until the Plan of Operation has been approved by FCIC. Once approved by FCIC, the Company's Plan of Operations becomes an Appendix to the Agreement.

(C)    If the Plan of Operations is not approved by FCIC by the July 1 start of the reinsurance year:

(i)    FCIC may, at its sole discretion, provide the Company with written notice:

(I)    Agreeing to reinsure and pay CAT LAE, A&O subsidy and risk subsidy for eligible crop insurance contracts that are renewed or sold by or on behalf of the Company while FCIC continues its evaluation of the Plan of Operations: or

(II)    Directing the Company and any of its service providers and agents to cease the renewal or sale of eligible crop insurance contracts until FCIC determines whether to approve or disapprove the Plan of Operations.

(ii)    Any eligible crop insurance contract sold or renewed after FCIC has provided written notice that the Company shall cease the renewal or sale of eligible crop insurance contracts until FCIC determines whether to approve or

disapprove the Plan of Operations will not be provided reinsurance, A&O subsidy, CAT LAE, or risk subsidy.

    (iii)    If FCIC authorizes the continued renewal or sale of eligible crop insurance contracts by or on behalf of the Company while FCIC completes its evaluation of the Plan of Operations and:

        (I)    Approves the Plan of Operations, the renewed and sold eligible crop insurance contracts will be reinsured under the newly approved Plan of Operations; or

        (II)    Disapproves the Plan of Operations, the eligible crop insurance contracts renewed or sold during the evaluation period will be transferred to FCIC and will be processed in accordance with section IX of Appendix I.

    (D)    The Company shall be in compliance with the Freedom to E-File Act and section 508 of the Rehabilitation Act. The Company shall file its plan for meeting the requirement of these statutory provisions, in accordance with Appendix II.

(g)    Access to Records and Operations

    (1)    Upon written request, unless otherwise authorized by the FCIC Manager, the Company shall provide FCIC reasonable access to its offices, personnel, and all records that pertain to the business conducted under, or the requirements contained in, this Agreement, including, but not limited to, access to records on the operation of the Company, at any time during normal business hours.

    (2)    The Company shall enter into, and enforce agreements to ensure that its affiliates provide FCIC and the Company with access to its affiliates' offices, personnel, and all records that pertain to the business conducted under, or the requirements contained in, this Agreement, including, but not limited to, access to records on the operation of such affiliate, at any time during normal business hours.

    (3)    The Company shall designate in its Plan of Operations where the records pertaining to the business conducted under this Agreement are located. In the case of electronic records, the location of computers or servers may be deemed the designated location.

DocuSign Envelope ID: F3D6B363-8354-43BC-8EC4-A681C905F5EF

(4)     Records described in this subsection shall be retained until 3 years after the last day on which records may be submitted through automated systems in accordance with Appendix III.

(5)     FCIC may require the Company and its affiliates to retain certain specified records for a longer period than required in paragraph (4) if it so notifies the Company in writing at any time before the expiration of the applicable 3-year period. If the applicable 3-year period has expired and the Company or its affiliate still has the records in their possession, FCIC can require that such records be retained for a longer period by providing written notice.

(6)     Notwithstanding paragraph (4), records regarding an unsatisfied debt of a policyholder shall be retained until the debt is satisfied or is discharged through bankruptcy proceedings.

(7)     For the purpose of this subsection the term "FCIC" includes all U.S. Government agencies including, but not limited to, USDA Office of Inspector General, the Government Accountability Office, and the Department of Labor.

(h)     Compliance and Corrective Action

(1)     The Company and its affiliates shall comply with the provisions of this Agreement, as applicable. The Company is solely responsible for the conduct and performance of its personnel and affiliates with respect to the obligations imposed by this Agreement and FCIC procedures. Liability for damages incurred, to the extent it is caused by an error or omission or failure to comply with this Agreement or applicable FCIC procedures, is the sole responsibility of the Company. The assumption of liability under this section is only for the purpose of this Agreement and may not be relied upon by any person or entity not a part to this Agreement for any purpose.

(2)     In addition to paragraph (1), the Company and its affiliates shall comply with FCIC procedures, and the applicable laws of the States in which the Company is conducting business under this Agreement, unless preempted in accordance with section IV(o).

(3)     The Company shall fully cooperate with FCIC in the review or examination of the Company or its affiliates regarding compliance with the requirements of the Agreement and FCIC procedures. The Company shall include in its agreements with its affiliates provisions that ensure that such affiliates agree to cooperate and assist FCIC in the reviews and examinations conducted in accordance with this Agreement.

(4)     In addition to any other remedies available under this Agreement, if FCIC finds that the Company has not complied with a provision of this Agreement, and the Company has not taken appropriate steps to correct the act of non-compliance, FCIC may, at its sole discretion, require that the Company take corrective action within 45 days of the date of making a written demand. The Company shall provide FCIC with satisfactory documentary evidence of the corrective action taken to address the act of non-compliance.

(5)     If a State makes a determination that the Company or its affiliates are not in compliance with state law and FCIC determines such non-compliance is material to the Company's obligations under this Agreement, and all appeals have been exhausted, FCIC will take remedial actions, which may include suspension or termination of this Agreement in accordance with section IV(i) and (j), denial of reinsurance, A&O subsidy, CAT LAE, and risk subsidy, for all eligible crop insurance contracts for which such non-compliance occurred, in whole or in part, depending on the materiality or severity of the non-compliance.

(6)     In addition to any other remedies in this Agreement, if FCIC determines that the Company or its affiliate willfully violated the Agreement or FCIC procedures, FCIC reserves the right to deny reinsurance, A&O subsidy, CAT LAE, and risk subsidy for any insurance contract that is sold or serviced in violation of the terms of this Agreement or FCIC procedures.

(7)     Whenever a failure to comply with a provision of this Agreement or FCIC procedures by the Company or its service providers, agents, and loss adjusters materially affects the existence or amount of the indemnity, prevented planting payment, replant payment, or premium for an eligible crop insurance contract (including, but not limited to, incorrect APH calculations; improper adjustment of losses; sales agents or sales supervisors involved in the adjustment of losses; failure to verify eligibility for insurance, acreage planted or prevented from being planted, insurable shares, insurable causes of loss, or unit division) and FCIC is:

(A)     Able to determine the correct amount of indemnity, prevented planting payment, replant payment, or premium, FCIC, except as provided in paragraph (8)(A), will deny A&O subsidy, CAT LAE, and risk subsidy or reduce the A&O subsidy or CAT LAE for the eligible crop insurance contract based on the severity of the failure, and require the Company:

(i)     To report to FCIC through PASS the correct amount of indemnity, prevented planting payment, replant payment, and premium;

DocuSign Envelope ID: F5D6B363-6354-43BC-8EC4-A681C905F5EF

      (ii)     To pay to the policyholder any amount of underpaid indemnity, prevented planting payment, replant payment, or overpaid premium; and

      (iii)    To pay to FCIC any overpaid indemnity, prevented planting payment, replant payment, or underpaid premium and any subsidy that exceeds the amount the Company or policyholder was entitled to receive.

(B)     Unable to determine the correct amount of indemnity, prevented planting payment, replant payment, or premium that should have been paid, FCIC shall deny reinsurance, A&O subsidy, CAT LAE and risk subsidy, in whole or in part, based on the severity of the failure, unless the Company can provide documentary evidence satisfactory to FCIC that shows the correct amount of the indemnity, prevented planting payment, replant payment, or premium.

(8)     The Company provides valuable program delivery services for which payment is made in the form of A&O subsidy and CAT LAE. FCIC and the Company agree that FCIC is damaged by a failure of the Company or its service providers, agents, and loss adjusters to provide services or to comply with a provision of this Agreement or FCIC procedures, and that the value of such service or failure to comply is difficult to determine because the damages are uncertain and the amount of service or failure to comply is difficult to quantify. FCIC and the Company agree that in view of the difficulty of determining the value of such service, the amounts stated below are reasonable estimates of the value. In the event there is a pattern or practice of failing to comply with the Agreement or FCIC procedures and FCIC has determined the Company or its service providers, agents, and loss adjusters have failed to provide services or to comply with a provision of this Agreement or FCIC procedures and such failure has occurred:

(A)     During the sales and service, claims, or operations process, the Company agrees to pay FCIC an amount up to the entire A&O subsidy or CAT LAE, as applicable, on all crop insurance contracts affected by the failure based on the materiality or severity of the failure, as determined by FCIC; and

(B)     If a pattern or practice under this paragraph also involves overpaid indemnities that may be collected under paragraph (7)(A), any reduction in A&O subsidies and CAT LAE will be imposed under this paragraph, not paragraph (7)(A).

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A681C905F5EF    Case 2:26-cv-02066-JWB-BGS   Document 1-2   Filed 02/02/26   Page 43 of 49

2025 SRA                                         07-01-24

(9)     Failure of the Company or its affiliates to cease or desist any activity or to take a specific action, as required by FCIC in writing, will subject the Company or its affiliates to the sanctions in section 515(h) of the Act (7 U.S.C. § 1515(h)).

(10)    Any payment due from, or paid by, the Company under this subsection shall be in addition, and without prejudice, to any other rights of FCIC, or the United States. FCIC may, at its sole discretion, waive, reduce or delay repayment if such actions are needed for continued delivery of the program.

(11)    Failure of the Company to make payment in accordance with the provisions of this Agreement, or with provisions of any separate written agreement to make such payment between the Company and FCIC, shall subject the Company to the remedies available under this Agreement.

(12)    Nothing in this subsection prevents FCIC from suspending or terminating this Agreement in accordance with section IV(i) and (j).

(13)    Nothing in this Agreement precludes the government from taking any actions authorized by law relating to fraud, waste, or abuse.

(i)     Suspension

In addition to the other remedies available in this Agreement, FCIC may suspend this Agreement for cause due to a material breach or failure to perform or comply with obligations under this Agreement. If this Agreement is suspended for cause:

(1)     Except as provided in paragraph (3), the suspension will remain in effect until FCIC determines that the error or omission has been corrected and that steps have been taken to prevent its occurrence.

(2)     While suspended, the Company shall not, as determined by FCIC:

     (A)    Sell, or authorize to be sold, any new crop insurance contracts;

     (B)    Renew, or authorize the renewal of, existing eligible crop insurance contracts; or

     (C)    Service any eligible crop insurance contracts in effect at the time of the suspension (A&O subsidy and CAT LAE will continue to be paid only for those eligible crop insurance contracts that FCIC requires to be serviced).

(3)     If the eligible crop insurance contracts are not serviced as required by paragraph (2)(C), or errors or omissions are not corrected within the

timeframe specified by FCIC, the suspension will remain in effect and this Agreement will automatically terminate at the end of the reinsurance year, or an earlier date if notice of termination is provided by FCIC, and A&O subsidy and CAT LAE will be denied.

(4)    Notwithstanding any other provision of this Agreement, during the period of suspension, the Company may submit a request to FCIC for approval by FCIC to not renew some or all of the existing eligible crop insurance contracts. Each request shall contain supporting documentation stating the basis for the request and the proposed implementation of the request.

(5)    Any eligible crop insurance contract that is sold or renewed if precluded by FCIC, while this Agreement is suspended will not receive reinsurance, A&O subsidy, CAT LAE or risk subsidy for such eligible crop insurance contracts.

(6)    Any eligible crop insurance contract not renewed in accordance with this subsection shall be canceled in accordance with the terms of the eligible crop insurance contract not later than 15 days before the next applicable cancellation date.

(j)    Termination

(1)    Notwithstanding any other provision of this Agreement, FCIC may terminate this Agreement for cause due to a material failure to perform or comply with this Agreement or the FCIC procedures, or for the convenience of the government.

(2)    Termination will be effective on the date specified by FCIC but under no circumstances will it be after the last day of the reinsurance year.

(3)    If this Agreement is terminated, FCIC will not provide reinsurance for eligible crop insurance contracts issued or renewed after the date of the termination. Except as otherwise provided in this Agreement, FCIC will provide reinsurance in accordance with the terms of the Agreement, for eligible crop insurance contracts in effect as of the date of the termination until the next cancellation date for the eligible crop insurance contract.

(4)    In addition to any other reductions provided in the Agreement, if this Agreement is terminated by FCIC for cause, the Company shall pay FCIC an amount not greater than 10 percent of the net book premium for all eligible crop insurance contracts in its book of business based on the materiality or severity of the cause. All amounts collected under this paragraph will be placed in the Contingency Fund.

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A681C905F5EF

(5)     After termination of this Agreement, unless otherwise specified in this Agreement, all of the Company's eligible crop insurance contracts in its book of business shall be cancelled in accordance with the terms of such contract not later than 15 days before the next applicable cancellation date.

(k)     Disputes and Appeals

(1)     If the Company disputes an action, finding, or decision of FCIC under this Agreement, the Company shall seek a final administrative decision regarding such action, finding, or decision in accordance with the provisions of 7 C.F.R. § 400.169 before seeking judicial review.

(2)     If the Company seeks a final administrative decision or reconsideration in accordance with 7 C.F.R. § 400.169, FCIC will, in most cases, issue a fully documented decision within 90 days of the receipt of a notice of dispute accompanied by all information necessary to render a decision. If a decision cannot be issued within 90 days, FCIC will notify the Company within the 90-day period of the reasons why such a decision cannot be issued and when it will be issued.

(l)     Agreement Change Date

(1)     This is a single year Agreement that ends June 30 of the reinsurance year. The Company can enter into a new Agreement under the terms and conditions, except for issuances and revisions pertaining to Appendix III, that exist as of March 15 preceding the reinsurance year by filing a Plan of Operations and obtaining approval from FCIC.

(2)     If Congress enacts legislation on or before June 30 that will affect the terms of the Agreement for the next reinsurance year, the Company may, within 15 days of the date of enactment:

(A)     Withdraw its Plan of Operations; or

(B)     Amend its Plan of Operations, according to FCIC procedures.

(m)     Funding Contingency

If Congress makes any change in law that will affect the amount of funds authorized to be paid under this Agreement, the affected provisions in this Agreement will be automatically revised to reflect such change in funding. Under no circumstance may a payment be made under this Agreement that is in excess of the amount authorized by law at the time such amount may be owed.

(n)    Previous Obligations

Any obligations continuing under any previous Agreement will remain subject to the terms and conditions of such previous Agreement.

(o)    Preemption of State Law

(1)    In accordance with section 506(l) of the Act (7 U.S.C. § 1506(l)), the provisions of this Agreement that are inconsistent with provisions of State or local law will supersede such law to the extent of the inconsistency.

(2)    The provisions of 7 C.F.R. part 400, subpart P pertaining to preemption of State or local laws or regulations are specifically incorporated herein and made a part hereof.

(3)    No assessment for any guarantee funds or similar programs may be computed or levied on the Company by any State for or on account of any premiums payable on eligible crop insurance contracts reinsured under this Agreement.

(4)    No State or local regulatory authority, including without limitation a State's insurance commissioner, department, or comparable public authority, may enforce or seek to enforce any provision of the Act, the regulations, this Agreement, or any FCIC procedures, without the prior written consent of FCIC.

(p)    Discrimination

The Company shall not discriminate against any employee, applicant for employment, insured, applicant for insurance, or potential applicant for insurance because of race, color, national origin, religion, sex, age, disability, marital status, or in retaliation for exercising his or her rights under applicable Federal law. The Company shall be in substantial compliance with all applicable Federal laws prohibiting discrimination.

(q)    Set Off

(1)    Funds due from the Company may be set off under the provisions of this Agreement or under the provisions of 31 U.S.C. chapter 37.

(2)    Any amount due the Company under this Agreement is not subject to any lien, attachment, garnishment, or any other similar process prior to that amount being paid under this Agreement, unless such lien, attachment, or garnishment arises under title 26 of the United States Code.

DocuSign Envelope ID: F5D6B363-8354-43BC-8EC4-A681C905F5EF

(3)     Set off as provided in this section will not deprive the Company of any right it might otherwise have to contest the indebtedness involved in the set off action by administrative appeal.

(4)     In the event a Company fails to pay any amount when due under this Agreement, any further payments to the Company from FCIC will be set off against any amounts due FCIC regardless of the reinsurance year until such amounts are paid with appropriate interest.

(5)     Notwithstanding an assignment made in accordance with section IV(r), FCIC may set off:

     (A)     Any amount due FCIC under this Agreement;

     (B)     Any amounts for which the Company is indebted to the United States for taxes for which a notice of lien was filed or a notice of levy was served in accordance with the provisions of the Internal Revenue Code of 1986 (26 U.S.C. § 6323), or any amendments thereto or modifications thereof, before acknowledgment by FCIC of receipt of the notice of assignment; and

     (C)     Any amounts, other than amounts specified in subparagraphs (A) and (B) due to FCIC or any other agency of the United States, if FCIC notified the assignee of such amounts to be set off at or before the time acknowledgment was made of receipt of the notice of assignment.

(r)     Assignment

(1)     No assignment by the Company shall be made of the Agreement, or the rights thereunder, unless:

     (A)     The Company assigns the proceeds of the Agreement to a bank, trust company, or other financing institution, including, but not limited to, any federal lending agency, or to a person or firm that holds a lien or encumbrance at the time of assignment; and

     (B)     The Company receives the prior approval of FCIC to assign the proceeds of this Agreement to any other person or firm.

(2)     Any assignment made under paragraph (1):

     (A)     Will be recognized only if and when the assignee thereof files with FCIC a written notice of the assignment together with a signed copy of the instrument of assignment;

DocuSign Envelope ID: F5D6B563-8354-45BC-8EC4-A881C905F5EF

(B)    Shall cover all amounts payable and not already paid under the
Agreement;

(C)    Shall not be made to more than one party; and

(D)    Shall not be subject to further assignment, except that any such
assignment may be made to one party as agency or trustee for two
or more parties.

DocuSign Envelope ID: F3D6B363-8354-43BC-8EC4-A881C905F5EF

2025 SRA                                                                    07-01-24

**Certification**

The undersigned acknowledges that the Company and its Board of Directors, if applicable, has authorized the Company to enter into this Agreement for the 2025 reinsurance year. The undersigned certifies that the information provided by the Company related to this Agreement is true and accurate and acknowledges that any misrepresentation in the submission of this Agreement and information provided by the Company related to this Agreement may result in civil, administrative, or criminal liability against the Company.

### APPROVED AND ACCEPTED FOR

| THE FEDERAL CROP INSURANCE CORPORATION | PRODUCERS AGRICULTURE INSURANCE COMPANY |
|---|---|

*David L Miller*
_____
Signature

David L. Miller
_____
Name

Director
_____
Title

6-27-2024
_____
Date

DocuSigned by:
_____
Signature

Kendall Jones
_____
Name

President and CEO
_____
Title

4/1/2024 | 12:27 CDT
_____
Date